# DECISIONS

OF THE

# Court of Appeals of Kentucky.

## SEPTEMBER TERM, 1901.

CASE 1—ACTION BY ROBERT J. BRECKINRIDGE AGAINST CLIFTON J. PRATT TO RECOVER AN OFFICE—NOV. 20.

## Pratt v. Breckinridge,

APPEAL FROM FRANKLIN CIRCUIT COURT.

JUDGMENT FOR PLAINTIFF AND DEFENDANT APPEALS. · REVERSED.

CONSTITUTIONAL LAW—INVASION BY LEGISLATURE OF POWERS OF EXECUTIVE—ELECTION BY LEGISLATURE OF ELECTION COMMISSIONERS—VALIDITY OF ACTS OF DE FACTO OFFICERS—POWER TO CREATE BOARD TO TRY ELECTION CONTESTS—STARE DECISIS—ARBITRARY POWER.

1. Act March 11, 1898, regulating elections, was, to the extent that it provided for the appointment of election commissioners by the Legislature, an invasion of the powers of the executive, and therefore unconstitutional; appointment to office being an executive power, and therefore a power which can be exercised by the Legislature only where the duties of the office pertain to the legislative department.

2. Though the Legislature had no power to appoint a board of election commissioners, yet as it did so, and the persons thus appointed, acted and were recognized as commissioners, they were *de facto* officers, and their acts were valid as to the public and third persons if legally appointed officers could have performed such acts.

3. Under Const., section 109, providing that "the judicial power of the Commonwealth, both as to matters of law and equity, shall be vested in the senate when sitting as a court of impeachment, and one supreme court (to be styled the court of appeals) and the courts established by this Constitution," and section 135, providing that "no courts, save those provided

for in this Constitution, shall be established," the Legislature has no power to create a board to try election contests, as such a board exercises judicial powers, and is therefore a court.

4. Const. section 153, providing that, "except as otherwise herein expressly provided," the General Assembly shall have power to provide by general law "for the trial of contested elections," does not authorize the Legislature to create a board with judicial powers to try election contests; the Legislature being expressly prohibited by Const., sec. 135, from establishing courts.

5. The doctrine of *stare decisis* does not require the court in every case to adhere to previous erroneous decisions.

6. It seems that the attempt of the Legislature to confer the power of contest on the election commissioners is in violation of Const., section 2, subd. 2, providing that "absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority;" one of the arbitrary features of the law being the fact that there is no provision by which the parties can escape a trial before the commissioners, though they may have made up and expressed their opinions, or may be bitterly prejudiced.

7. As the Legislature had no power to create the board of contest, its decision was void, and conferred no right upon the contestant.

W. O. BRADLEY, FOR APPELLANT.

1. In so far as the statute undertakes to make the board of election commissioners, a board of contest, it is unconstitutional, and a title derived from its action is worthless.

2. The board has no jurisdiction to render a decision. The Legislature had no constitutional authority to create the board; or if it had such power and the board acted outside the authority conferred, the judgment is absolutely void, confers no title, and can not be used to enable appellee to recover, or hold the office.

Under the election law, the duties and powers of the election board are these:

(a) Where it appears that the candidates have received the same number of votes, the right to the office may be determined by lot, under their direction.

(b) To order a new election where the person returned, is found not to have been legally qualified to receive the office at the time of his election.

Pratt v. Breckinridge.

(c)  To adjudge that another man than the person returned has received the highest number of legal votes  cast—was elected, and is entitled to the office.

No other  powers are conferred.

3. Appellant was deprived of his office arbitrarily.

Pryor and Ellis had given the certificate  to Pratt.  Poyntz, the other member of the board filed a dissenting opinion, holding that the plaintiff, Breckinridge, had been elected and openly stated  that  he was entitled to the office.  Then, when Pryor and Ellis resigned, Poyntz appointed Fulton as a member, who had published in the newspapers over his signature an article declaring that the vote of Louisville should be excluded, which was the main issue in the contest.

So, we contend, a trial such as was given by  the contest board, even  if it had the right to  pass upon the questions involved, was absolutely void.

4. Doctrine of Stare Decisis.

The appellee can not escape by invoking the doctrine of *stare decisis*:

(1)  Because a void judgment can not be cured or sanctified.

(2)  Because the decision in Sweeney v. Coulter is void.

(3).  Because the questions here presented were not directly passed upon in that decision.

(4)  That opinion is not the law and will not be adhered to.

## AUTHORITIES CITED.

1. Contest board a judicial body and created in violation of the Constitution.  Sec. 1, art. 5, 1st Constitution of Kentucky; sec. 1, art. 4, 2d Constitution of Kentucky; sec. 1, art. 4, 3d Constitution of Kentucky; sections 109, 135, 153 present Constitution of Kentucky; Webster's Dictionary, Titles "Court," "Adjudge," "Judgment;" sec. 12, p. 649, Kentucky Statutes; Com. v. Jones, 10 Bush, 749; secs. 311-368, Civil Code; Bouvier's Law Dict., Title, "Trial;" Rapalje's Law Dict., Title "Trial;" Black's Law Dict., Title "Judgment" Sweeney v. Coulter, 22 Ky. Law Rep., 885 to 891.

2. The board, if constitutional, has exceeded jurisdiction, and action void.  Newcum v. Kirtley, 13 B. Mon., 517; Batman v. Megowan, 1 Metc., 533; Stine v. Berry, 96 Ky., 63; Anderson v. Likens, 20 Ky. Law Rep., 1004; Booe v. Kenner, 20 Ky. Law Rep., 1343; Acts 1850, p. 92; Com. v. Jones, 10 Bush, 725; Taylor v. Beckham, 21  Ky. Law Rep., 1747; Leeman v. Hinton, 1 Duv., 38; Pendleton v. Hocker, 100 Ky., 726; Wilson v. Hines, 99 Ky., 221; Sec. 21, Con. of Ky.; Nall v. Tinsley, 21 Ky. Law

Rep., 1172; Cooley Con. Lim. Star page, 616, 621; People v. Soloman, 46 Ill., 415; Howes v. Perry, 92 Ky., 262.

3. Action of board arbitrary and void. Section 1535, sub-div. 1, Kentucky Statutes; U. S. v. Lee, 106 U. S., 196; 220; Yick. Wo. v. Hopkins, 118 U. S., 373; Chi Lung v. Freeman, 9 U. S., 275; *Ex Parte* Virginia, 100 U. S., 339; Noel v. Delaware, 103 U. S., 370; Soon Hing v. Crowley, 113 U. S., 703; Henderson v. Mayor N. Y., 92 U. S., 259; sec. 1, sub-sec. 3, Pres. Cen. Ky., Sanford v. Wingate, 2 Duv., 445; Page v. Hardin, 8 B. Mon., 672; Bailey v. Com., 81 Ky., 401.

4. Doctrine of *stare decisis.* Bouvier's Law Dictionary, Title, *"Stare Decisis,"* Callendar v. Keystone, &c., 23 Penn. Stat., 471; Bradley v. Salter, 6 Bush, 624; Bradley v. George MSS Opinion (Garrard), May 27, 1884; Civil Code, sec. 741, 759; Sweeney & Coulter, 22 Ky. Law Rep., 399.

M. C. AND G. D. GIVENS, FOR APPELLANT.

1. The State board of election commissioners are purely executive or ministerial officers, and can not exercise judicial functions. See secs. 27 and 28, Constitution of Kentucky.

2. Contested elections involve questions essentially judicial so held by all authority and questioned by none.

3. The act of the Legislature regulating elections, passed March 11, 1898, is void so far as it attempts to convert the board of election commissioners into a contest tribunal with judicial powers, see secs. 27 and 28, Constitution, also see Jarman v. Patterson, 7 T. B. Monroe, 649, Commonwealth v. Jones, 10 Bush, 725; Pennington v. Woodfolk, 79 Ky., 13; Muhlenberg County v. Morehead, 20 Ky. Law Rep., 376; see, also, latter clause of sec, 41, art. 4, Constitution of 1850.

4. Regardless of how or by whom composed, the Legislature can not create a contest court or tribunal by any name or for any purpose. See secs. 109 and 135 of the present Constitution, also Roberts v. Hackney, 22 Ky. Law Rep., 975. The acts of such tribunal are void.

5. Section 153 of the Constitution makes it the duty of the Legislature to determine which of the constitutionally established courts shall have jurisdiction of contested elections, and the mode of proceeding therein.

W. S. PRYOR AND HAZELRIGG & CHENAULT, FOR APPELLEE.

The main points raised by counsel for appellant in this case are:

(1) The statute creating a board of contest called "election commissioners" is unconstitutional, for the reason it clothes that board with judicial powers.

Pratt v. Breckinridge.

(2) That the contest board is a court, a creature of the Legislature, and in direct violation of the Constitution.

It has been held by this court and the supreme court, that the legislation under which Taylor was ousted from the office of governor and that office given to Goebel was constitutional.

That the action of the board of contest in giving Coulter and Hager the offices of auditor and treasurer was constitutional, and now these decisions are asked to be disregarded— *the same law, the same testimony and the same court holding under the same Constitution*, that the act is constitutional as to *three,* and unconstitutional as to *one.*

The cases unanimously upholding the exercise of judicial power by the contest board since the adoption of the new Constitution are:  Struss v. Johnson, 18 R., 171; Banks v. Sargent, 20 R., 1027; Major v. Barker, 99 Ky., 310; Creech v. Davis, 21 R., 325; Vincent v. Tunks; Strong v. Jones, 19 R., 1298; Wilson v. Hines, 99 Ky., 221; Anderson v. Likens, 20 R., 1006.

Such boards have been created by former Constitutions with the power to determine such controversies.  The good or evil growing out of the decisions of such boards were known to the framers of that instrument, and they confided the power to create such boards with the Legislature and to no other tribunal.

Section 153 of the Constitution provides that the *General Assembly shall have power to provide by general law for the trial of contested elections.*  If it be termed a court, it is then a creature of the Constitution, and the mode of creating it and conducting the trial of contested elections is left alone with the Legislature.

### JURISDICTION OF THE BOARD.

It is the duty of the contest board to determine who has received the highest number of legal votes cast, and to adjudge to him the office.  In so determining, illegal votes are to be disregarded, and even entire precincts ignored.  In this case it was determined by the board that by reason of intimidation and the presence of militia in the city of Louisville the vote of that city should not be counted, and that because of the use of tissue ballots in the county of Magoffin and other counties the vote of those counties should not be counted.

The power thus exercised is not so comprehensive as the power it was entitled to exercise under the opinion of this court in Wilson v. Hines or Creech v. Davis.

Pratt v. Breckinridge.

## AUTHORITIES CITED.

Ky. Constitution, secs. 109, 135, 153; Purnell v. Mann, 21 R., 1129 (50 S. W., 784); Civil Code, sec. 759; Sweeney v. Coulter, 109 Ky., 295; Cooley Con. Lim. (6th Ed.), p. 64; Same, p. 787; Civil Code, 480; Boyd v. Chambers, 78 Ky., 140; Batman v. Megowan, 1 Metc., 539; 13 Ben Monroe, 517; Com. v. Jones, 10 Bush, 726; 19 Am. & Eng. Ency. Law, 394; 5 Am. & Eng. Ency. of Law, 96; People v. Chase, 165 Ill., 527; Booe v. Kenner, 20 R., 1343; Banks v. Sargent, 20 R., 1027; Creech v. Davis, 21 R., 327; Wilson v. Hines, 99 Ky., 224; Leaman v. Hinton, 1 Duv., 40; Major v. Barker, 99 Ky., 310; Newcum v. Kirtley, 13 B. Mon., 517.

OPINION OF THE COURT BY JUDGE GUFFY—REVERSING.

Appellee brought suit in the Franklin circuit court against appellant, alleging that they were the candidates for their respective parties and voted for at the general election of November 7, 1899, for the office of attorney general; that the State board of election commissioners canvassed the returns of the election, and determined upon the face of the returns that appellant was elected, and thereupon awarded him a certificate of election, whereupon he qualified and entered upon the discharge of his duties; that appellee gave appellant notice that he would contest the election before the State board of election commissioners, sitting as a contest board, upon various grounds, and did so contest the election before that board, as a result of which the board adjudged that appellee had received the highest number of legal votes cast for the office and was elected thereto, and that appellant was not elected, and thereupon issued to appellee a certificate that he had been elected to the office of attorney general and was entitled thereto. Copies of the notice of contest, the proceedings of the board thereunder, its judgment, and the certificate delivered to appellee were filed as exhibits with the petition. The prayer was for the possession of the

office and for an injunction restraining appellant from interfering with appellee in the discharge of the duties thereof, and from claiming to have title thereto.    In various regards and upon various grounds appellant, by answer and counterclaim called in question the validity of the election law of 1898, under which the State board of election commissioners was organized and had acted, and also the validity of the action of the board in the trial and decision of the contest.    The prayer of the answer and counterclaim was that appellee should be adjudged to have no title to the office, that appellant should be adjudged entitled thereto, and that appellee should be restrained from attempting to exercise the duties thereof. A demurrer filed to the petition was overruled, but was carried forward to the answer, sustained, and a judgment rendered in accordance with the prayer of the petition.

"An act to further regulate elections," adopted by the Legislature on March 11, 1898 (Act 1898, p. 43), over objections by the governor, under which act the State board of election commissioners was organized, is inherently vicious, because an invasion by the Legislature of the powers of the executive.    The provisions embodied in sections 27 and 28 of the Constitution, and which, in substantially the same words, have been embraced in every Constitution of the State, were drawn by Mr. Jefferson as an improvement upon the provision of the federal Constitution, designed by him to insure a more perfect separation of the powers of the three great departments of government than was secured by that instrument, and their adoption by the convention was accomplished by the power of his name:

"Sec. 27.    The powers of the Government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a sep-

arate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

"Sec. 28. No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted."

The Constitution of the United States contains a similar division of powers, but without the inhibition against one department exercising powers which properly belong to another.

There is no pretext that the offices created by the act in question are legislative agencies. They are offices coming fully within the test defined by Chief Justice Lewis in City of Louisville v. Wilson, 99 Ky., 598, 18 R., 427, 36 S. W., 944: "There are various tests by which to determine who are the officers in the meaning of the law, but at last, in case of uncertainty, the intention of the lawmakers controls. To constitute an officer, it does not seem to be material whether his term be for a period fixed by law, or endure at the will of the creating power; but if an individual be invested with some portion of the functions of the Government, to be exercised for the benefit of the public, he is a public officer.". The power of appointment to office was, in an opinion by Chief Justice Robertson delivered in 1830, in Taylor v. Commonwealth, 3 J. J. Marsh., 401, held to be "intrinsically executive." Said the court in that case: "And, although the Constitution has confided to the courts the appointment of their own clerks, still the nature of the power is not changed. It is essentially executive, whensoever or by whomsoever it may be exercised. It is as much executive when exercised by the court as by the governor. It is the prerogative of appointing to office, and

is of the same nature, whether it belonged to the court or to the governor." The Constitution in force at that time authorized the court to appoint its own clerk. So, in Justices v. Harcourt, 4 B. Mon., 500, it was said in an opinion by Chief Justice Ewing: "But this power is an executive, and not a judicial power. It appertains to and is exercised in aid of the appointing power, which is executive and not judicial." This doctrine was approved in an opinion by Judge Marshall in Gorham v. Luckett, 6 B. Mon., 159, and again in Applegate v. Applegate, 4 Metc., 237. This doctrine has been quoted and followed by many courts of last resort. Until the legislation of 1898 was under consideration, it seems never to have been disapproved in this State, and then the cases in which it had been adjudged were not mentioned. By section 29 of the Constitution, the "legislative power" is vested in a house of representatives and a senate, together styled the "General Assembly." The Legislature, being by this grant vested with all legislative power, may do everything that can properly be done by the enactment of a law, and in addition thereto may do everything that by the Constitution it is expressly directed or permitted to do. Each house may perform the executive act of electing its own officers (sections 34 and 249), and the judicial acts of judging of the qualifications, elections, and returns of its members (section 38) punishing disorderly behavior and expelling members (section 39). The framers of the Constitution having deemed it necessary to expressly permit the Legislature to exercise the executive power of appointment in specified cases, this permission, by implication, forbids the Legislature to exercise such power in any other case. The creation of an office is accomplished by the exercise of legislative power. It is done by the enactment of a law.

The filling of it, when not exercised by the people, or in some manner directed or permitted by the Constitution, is executive, and must be performed by an executive officer. The Congress of the United States, deriving its authority from a Constitution which does not contain the inhibition of section 28 of the Kentucky Constitution, has never passed an act which created an office, and at the same time filled it. Only once has it attempted to do so. It is not denied that the legislative department can appoint or elect an officer when the duties of the office appertain to that department. And in this is found whatever justification exists for the Legislature's election of the State librarian,—an office which, without any violent stretch of construction, may be considered as appertaining to the legislative department. But, while the three commissioners provided for in this act are both executive and judicial officers, they are not in any sense legislative. They perform executive functions in appointing to and removing from office and in canvassing the returns, and judicial functions in deciding contests. But they perform no functions connected with the Legislature. The Legislature has no more power to elect or appoint such officers than it has to enact a law providing the judgment to be entered in a pending litigation.

In State v. Kennon, 7 Ohio St., 547, it was said: "The official or unofficial character of the officers is to be determined . . . by the nature of the functions devolving upon them. . . . To prescribe the manner of election or appointment to office is an ordinary legislative function. To make an appointment is an administrative function." The Ohio Constitution forbids the exercise of the appointing power by the Legislature, but the court is here discussing the nature of the function. In Langenberg v.

Decker, 131 Ind., 478, 31 N. E., 193, 16 L. R. A., 112,—and the Indiana Constitution contains a provision like ours,— it was said: "The powers of these departments are not merely equal. They are exclusive in respect to the duties assigned to each, and they are absolutely independent of each other. The encroachment of one upon the other is watched with jealous care, and is generally promptly resisted, for the observance of this division is essential to the maintenance of a republican form of government. . . . It can not be contended that the State board of tax commissioners belongs to the legislative department. . . . It can not be successfully maintained that the Legislature could confer upon the governor and principal officers of the State duties pertaining to the judicial department. As the State board of tax commissioners is neither a legislative body nor a court, it must belong to the executive and administrative department. That it does belong to that department, we think, is too plain for argument. It is charged with executing certain provisions of the revenue law, and when it has performed that duty its function is ended." In City of Evansville v. State, 118 Ind., 426, 21 N. E., 267, 4 L. R. A., 93, the court said: "The power to appoint to office is an executive function, and, while the Legislature may provide by law for the appointment of all officers not provided for in the Constitution, the appointing power must be lodged somewhere within the executive department of the Government." And see State v. Denny, 118 Ind., 382, 21 N. E., 252, 4 L. R. A., 79; City of Evansville v. State, 118 Ind., 426, 21 N. E., 267, 4 L. R. A., 93; State v. Denny, 118 Ind., 449, 21 N. E., 274, 4 L. R. A., 65; and State v. Hyde, 121 Ind., 20, 22 N. E., 644. In the case of supervisors of election, 114 Mass., 251, 19 Am. Rep., 344, the Legislature had conferred upon the supreme

court the power of appointment of supervisors, and that court held the act unconstitutional, and refused to exercise the power, saying: "These supervisors, although intrusted with certain discretion in the performance of their duties, are strictly executive officers. . . . Their duties relate to no judicial suit or proceeding, but solely to the exercise by the citizens of political rights and privileges. We are unanimously of opinion that the power of appointing such officers can not be conferred upon the justices of this court without violating the Constitution of this Commonwealth. We can not exercise this power as judges, because it is not a judicial function." In Jones'. Heirs v. Perry, 10 Yerg., 59, (30 Am. Dec., 430), the court said: "The whole judicial power of the State being expressly invested in the courts by the Constitution, the exercise of it by the Legislature transcends the power intrusted to it by the Constitution, and can not be legally carried into effect." In re McLean (D. C.) 37 Fed. 648. under the federal Constitutio, which contains no such inhibition as that contained in our organic law, it was held that the pension bureau was not a court, and no officer thereof could be invested with judicial functions; that Congress, therefore, could not authorize the attendance of a witness before a pension examiner, to be compelled by the district court. So, in Kilbourn v. Thompson, 103 U. S., 168, 26 L. Ed., 377, it was held that Congress could not punish as for contempt a witness who refused to testify concerning transactions of persons whose conduct was then under investigation by a judicial tribunal, because that was an encroachment upon the judicial department. In Field v. Clark, 143 U. S., 692 (12 Sup. Ct., 504, 36 L. Ed., 310), it was said: "Congress can not, under the Constitution, delegate its legislative power to the president." In

Pratt v. Breckinridge.

Cooley, Const. Lim., p. 104, it is said, speaking of the legislative department: "But the apportionment to this department of legislative powers does not sanction the exercise of executive or judicial functions, except in those cases warranted by parliamentary usage, where they are identical, necessary, or proper to the exercise of legislative authority, or where the Constitution itself, in specified cases, may expressly permit it." And on page 108 he says: "The legislative power we understand to be the authority under the Constitution to make the laws, and to alter and repeal them,"—and quotes from Justice Marshall: "The difference between the departments undoubtedly is that the legislative makes, the executive executes, and the judiciary construes the law."

There are, it is true, cases in other States in which a different view is taken of this question. In many of them the question presented may readily be distinguished from that presented for decision by this court. For example, the Maryland case (Mayor, etc., of City of Baltimore v. State, 15 Md., 376) (74 Am. Dec., 572) arose under a constitutional provision which provided merely that "the legislative and executive and judicial powers of government ought to be forever separate and distinct from each other," —a provision containing no express inhibition, but merely a declaration as to what was proper. And in Oregon, in the case of Biggs v. McBride, 17 Or., 640 (21 Pac., 878, 5 L. R. A., 115), the decisions of the court are directly contrary to the view expressed by Chief Justice Robertson,— that the power of appointment to office is "intrinsically executive." But in this State it may be asserted that until 1898 the trend of judicial opinion has, wherever the question has arisen, been uniform. So, also, has the spirit of each successive change in the organic law of the Com-

monwealth been in the direction of more strictly limiting
the legislative power.    In fact the changes in the organic
law' would lead to the conclusion that there existed in the
minds of the people a deep-seated distrust of legislative
methods, and a fear of legislative usurpation of power.
Section 59 of the present Constitution, as to local and spe-
cial legislation, is an illustration of this.    In that section
28 subjects are enumerated in regard to which local or
special acts are forbidden to be passed by the General
Assembly, and in the twenty-ninth clause it is provided:
"In all other cases where a general law can be made ap-
plicable, no special law shall be enacted."

To show the tendency and policy of the Kentucky court
upon this subject, the case of City of Louisville v. Cochran,
82 Ky., 15 (5 R., 833), may be cited.    There the
General Assembly had passed an act with relation
to back taxes in the city of Louisville, which pre-
scribed the form of the petition to recover them;
that only certain defenses should be allowed by the
court; that all the affirmative allegations of the answer
should be held controverted; and the tax bills be evidence
of every fact necessary to entitle the city to recover.    The
act was held to be unconstitutional and void.    The opin-
ion, by Chief Justice Hargis, admitted that the Legislature
might by law make the production of certain documents
*prima facie* evidence of certain facts, but held that it could
not dispense with allegations of essential facts necessary
to the statement of the cause of action, or exclude a de-
fendant "from showing the truth by a mere legislative
declaration to that effect."    And the court continued,
quoting from Mr. Webster:    "If such results as this act
seeks to accomplish could be reached by the methods it
prescribes, it would tend directly to establish the union of
all powers in the Legislature.    There would be no

general, permanent law for the courts to administer, or
men to live under.    The administration of justice would
be an empty form and an idle ceremony.    Judges would
sit to execute legislative judgments and decrees, not to
declare the law or administer the justice of the country."
In Johnson v. Ferrell (8 R., 216), 1 S. W., 541,
the Cochran case was approved of and followed in
an opinion by Chief Justice Pryor.    In Slaughter
v. City of Louisville, 89 Ky., 123 (12 R., 61)
(8 S. W., 920), this court, in an opinion by Judge Bennett,
recognizing the binding force of the constitutional provi-
sion, interfered to prevent an encroachment by the Leg-
islature upon the power of the executive.    In that case
the inquiry was, "Can the Legislature, in order to author-
ize the collection of *ad valorem* taxes, fix the valuation
upon the property to be assessed?"    Said the court:    "It
seems to be well settled that the Legislature, as the law-
making department of the State government, has no con-
stitutional power to fix the valuation of property which is
to be taxed upon *ad valorem* principles.    The reason for
this rule is that the legislative department has no judicial,
executive, or ministerial powers, and, as the valuation in
this State belongs to the ministerial powers of the Govern-
ment, it follows that the Legislature has no constitutional
power to make the valuation. . . .    The Legislature,
having no judicial, executive, or ministerial power, can not
make the valuation; but the valuation must be made by
some person authorized to exercise in this State ministe-
rial power, and such person is the assessor,"—citing Peo-
ple v. Hastings, 29 Cal., 452, and People v. San Francisco
Sav. Union, 31 Cal., 138.    And in Morgan v. Vance, 4
Bush, 323, it was held that the Legislature could not by
statute remove the disabilities incurred by dueling, that
power belonging to the executive.

An apparent exception to the rule is found in the case of the county courts.    That arose and is justified in this way:    Prior to 1792, when Kentucky formed a part of the territory of Virginia, the county courts of that State were not only courts of justice but were clothed with executive and fiscal duties, and, from the time Kentucky became a State, had continued to exercise those powers and perform those duties.    And so, in Pennington v. Woolfolk, 79 Ky., 13, (3 R., 42), Chief Justice Cofer concluded, from this unbroken practice of nearly 80 years, uniformly acquiesced in by all the departments of the government, during which period the Constitution had been twice amended and re-adopted, that "the convention must be presumed to have been well acquainted with the fact that these non-judicial powers had been conferred by various acts, and were being exercised by the county courts, and the re-adoption of the first article in the very words of the former Constitution was a virtual recognition of the validity of the statutes by which these powers had been from time to time conferred," and that "the county court must be regarded, as respects a number of matters, local and exceptional in their nature, as excepted out of these provisions of the Constitution." The present Constitution legitimizes this exception and confers upon the county courts administrative functions. Sections 141, 144.    But this court has never, until 1898, overlooked an encroachment by the Legislature upon the functions of either of the executive or judicial departments.

Says Mr. Cooley (Const. Lim., p. 105):    "Every positive direction in the Constitution contains an implication against anything contrary to it which would frustrate or disappoint the purpose of the provision."    And again (page 178):    "When the Constitution defines the circum-

Pratt v. Breckinridge.

stances under which a right may be exercised,  . . . the specification is an implied prohibition against legislative interference to add to the condition." Now, by section 153 it is declared that, "except as otherwise herein expressly provided, the General Assembly shall have power to provide by general law for the manner of voting, for ascertaining the result of elections," etc. It seems clear that, in a grant of power to provide for the manner of voting, the framers of the Constitution, and the citizens whose votes gave that instrument vigor as organic law could not have dreamed that they were conferring on the Legislature itself the power of electing to office. The grant of this power directly implies a negation of the power of the legislators themsives to do the voting, the manner of which they are authorized to provide for. But, if the Constitution did so authorize them, is it pretended that they have followed the behest of the general law providing for the manner of voting by the secret or Australian ballot? And the contention that election by the Legislature is impliedly prohibited is strengthened when we examine section 152, providing for vacancies in elective offices arising during a term. In all cases the office is to be filled by appointment, but the term for which the appointment may be made varies according to the length of time to elapse before the next annual election; referring, clearly, to the election at which under section 153, the General Assembly has the power to provide by general law for the manner of voting, etc. The General Assembly, wherever named in the Constitution, is either authorized or directed to "provide by law" (sections 136, 147), to make "provision by law" (section 185), or to "provide by appropriate legislation" (section 183), for the purposes authorized by the Con-

stitution, or it is forbidden to pass an act as to some desig-
nated subject (sections 59, 60), or its power is limited as
to certain matters, such as laying out of new counties, re-
moving of county seats (sections 63, 64), and as to the ex-
ercise of various other functions uniformly recognized as
parts of the legislative power.    From this it seems clear
that the makers of the Constitution intended the Legisla-
ture to discuss and enact laws, and to do nothing else.    If
the Legislature may provide for the election by itself of
these officers, it undoubtedly may, under section 107, which
authorizes it to "provide for the election or appointment
for a term not exceeding four years of such other county
officers, or district, ministerial and executive officers, as
may from time to time be necessary," elect all of the 350
county commissioners provided for in this law, and every
other appointive officer in the Commonwealth.    "The ex-
ercise of such power would," as said by the governor in his
veto message, "destroy the very object for which the legis-
lative department was created."

It is not to be supposed for a moment that, in vesting
the General Assembly with legislative power, it was imag-
ined by the convention or the people that that body, by the
mere passage of a so-called act conferring upon itself pow-
ers which properly belonged to the other departments, could
usurp their functions.    If it can do so, then we do not live
under a constitutional Government, but the General Assem-
bly, like the British parliament, is supreme.    It was held
in the George case (20 R., 938), (47 S. W., 779), ap-
proved in Purnell v. Mann, 105 Ky., 87 (20 R., 1146),
(48 S. W., 407), that the Legislature, unless in-
hibited by the Constitution (and those opinions hold
that there is no inhibition), may exercise its power in any
one of three modes: It may by statute create an office,

Pratt v. Breckinridge.

and name persons who are to fill it.  It may by law create an office, and provide that it shall be filled by election or appointment by the Legislature in joint convention assembled, or by appointment by any person or body of persons. If the first proposition—which is, of course, mere dictum—be true, then the twenty-ninth clause of section 59 ("in all other cases where a general law can be made applicable, no special law shall be enacted") is a nullity; for the General Assembly could have provided that the three commissioners should, from and after a named date, be commissioners of election, which undoubtedly would have been a special law in a case where a general law could have been made applicable.  Moreover, this dictum is in direct conflict with the case of Clarke v. Rogers, 81 Ky., 44 (4 R., 929), in which, in an opinion by Judge Pryor, it was held that the Legislature could not, without a local vote upon the question, when changing a town government by trustees into a city, continue the old trustees as councilmen under the new charter.  Said Judge Pryor in that case: "Under our elective system, by reason of the provision of the Constitution in regard to the election of officers for town and cities, and other provisions of that instrument relating to State and county officers, the Legislature has no power to appoint to office or to continue in office such officers as by the provisions of the Constitution are made elective; and the attempt to exercise such a power by legislative enactment is in plain violation of its provisions.  Section 10 of article 68 of the Constitution provides that 'the General Assembly may provide for the election or appointment, for a term not exceeding four years, of such other county or district, ministerial and executive officers as shall from time to time be necessary and proper.'  But the officers required to be elected by the Constitution can not be appointed to or con-

tinued in office by legislative enactment, without consulting
the popular will." This opinion clearly holds that, even
under the third Constitution of this Commonwealth—far
more loosely drawn in regard to restrictions upon the
power of the Legislature than the present Constitution—
the Legislature, under grant of power to provide for the
election or appointment of an officer, could not itself elect
or appoint to the office; and this by virtue of a provision
which is copied in section 107 of the present Constitution.

This act is also vicious in the provision that vacancies
may be filled by the remaining members or member of the
board. Under section 152 of the Constitution, how are
vacancies in such offices to be filled? The act is claimed to
be in compliance with section 153, in that it provides that
the Legislature shall elect the commissioners. The act
provides that vacancies "shall be filled by appointment by
the remaining member or members of said board,"
but section 152 provides that "vacancies in all the
offices for the State at large, or for districts larger
than a county, shall be filled by appointment of the
governor." Surely this provision of the law is unconstitu-
tional, as the commissioners are undoubtedly officers for
the State at large. The Constitution must control, and
the governor's appointee must hold, not until the next ses-
sion of the Legislature, but, according to the explicit
terms of section 152, until the next general election.
And, further, by section 148 it is provided that "not more
than one election each year shall be held in this State, or in
any city, town, district or county therein except as other-
wise provided in this Constitution." As the Legislature
can not be in session at the time fixed for the annual elec-
tion, unless by special call of the governor, how can the

Legislature, under this section of the Constitution, exercise the power which it has usurped? The answer is that the Constitution did not contemplate that any officers, except those specially provided for, should be elected by the Legislature. Section 76 provides that the governor "shall have the power, except as otherwise provided in this Constitution, to fill vacancies," etc. Nowhere, except in section 152, is it "otherwise provided" how vacancies shall be filled. That section was intended to cover the whole ground, and, as it provides that such appointments shall remain in force until the next general election, negatives the idea of an election by the Legislature. The federal Constitution, which gives to the Legislature of the State the power to elect a United States senator, and provides for appointment by the governor to fill vacancies occurring during the recess of that body, provides for "temporary appointments until the next meeting of the Legislature." Such an appointment (until the next meeting of the Legislature) of a State officer is not permitted under our Constitution to the governor, who alone has power to fill a vacancy in a State office.

The cases of Purnell v. Mann (105 Ky., 87), (20 R., 1146), (48 S. W., 407); Poyntz v. Shackelford, 107 Ky., 546, 107 Ky., 546 (21 R., 1323), 54 S. W., 855), and Sweeney v. Coulter, 109 Ky., 295 (22 R., 885), (57 S. W., 254, 470), are overruled.

It may be conceded, however, that the Legislature had the power, and exercised it, to create a board of election commissioners, and that this board was filled, and the persons who filled it assumed to act, did act, and were recognized, as commissioners. Therefore, as legal offices existed, and persons were recognized as officers, they were de facto officers, and their acts were valid as to the public and third persons, if legally appointed officers could legal-

ly have performed such acts. Whether this board of *de facto* commissioners exercised powers forbidden by the Constitution, or beyond their constitutional and legal jurisdiction, remains to be considered. Considering that the creation of a ministerial board of election commissioners, with power to act as a board of canvassers, was within the legislative power, was it a violation of sections 27 and 28 of the Constitution to clothe such officers with the judicial power to determine a contested election? It may be assumed that the determination of an election contest is, in its essence, judicial. Such a contest is a litigation over a right. The decision of a litigation over a right claimed by one party and denied by another is a judgment. On the other hand, for half a century boards for the trial of contested elections have existed, and exercised the powers conferred by the Legislature, without objection upon the ground now urged, although under the statute it was possible at all times that a ministerial officer might be included in the membership of the board, and in many instances was so included. This, it is insisted, indicates a contemporaneous construction by the public and all the departments of government that the judicial function of determining an election contest may be exercised by a ministerial officer, and such exercise is a tacit exception, like the ministerial powers of the county court, to the general division of the powers of government provided for in the sections named. There is so much force in this argument that we should hesitate to declare the statute unconstitutional on the sole ground that it is violative of sections 27 and 28, which divide the powers of government, and have been continued in all the Constitutions. But the present Constitution contains an entirely new provision, taking from the Legislature all power to create any court in addi-

tion to those established by the Constitution. Was the grant by the statute to the board of election commissioners of power to try contested elections a violation of sections 109 and 135 of the Constitution, as being the creation of a court other than those established by the Constitution? This presents a new question, which could arise only under the new Constitution. In all the previous Constitutions, there is to be found a provision which directly authorized judicial power to be conferred upon such inferior courts as the Legislature might from time to time establish. But the present Constitution not only does not permit the creation of such tribunals, but absolutely forbids it. Section 109 provides: "The judicial power of the Commonwealth, both as to matters of law and equity, shall be vested in the Senate when sitting as a court of impeachment, and one supreme court (to be styled the court of appeals) and the courts established by this Constitution." And, again, section 135 provides: "No courts, save those provided for in this Constitution, shall be established." A board to try election contests is a court. The word "contest," in constitutions and statutes, is a word of art. It has a distinct, defined meaning. It is a litigation. It implies a plaintiff and a defendant, and a thing in controversy. When it is decided, it is, or should be, decided upon evidence, and the decision is a judgment. Whatever the body may be called which decides an election contest,—whether "board" or "tribunal,"—it is, in all its elements, a court. If, therefore, such a court can be created, authority for its creation must be found elsewhere in the Constitution. Such authority is claimed to be given by section 153: "Except as otherwise herein expressly provided, the General Assembly shall have the power to provide by general law for the manner of voting, for ascertaining the result of elections

and making due returns thereof, for issuing certificates or commissions to all persons entitled thereto, and for the trial of contested elections." The argument, broadly stated, is that the exception at the beginning of the section applies to each of the grants of power contained therein, but that, as applied to the grant of power to provide by general laws for the trial of contested elections, it is satisfied by a reference to the provision for the trial of contested elections for governor and lieutenant governor by the Legislature itself, and that but for this exception it is an unlimited grant of power. If this be so, and the power to determine the contested elections is only *quasi* judicial, or not so judicial as to prevent its exercise by members of the two other bodies of magistracy, then it follows that the Legislature might itself, under the Constitution, try and determine every contested election which might arise. Nor would the exclusion drawn by implication from the specific grant to the Legislature of power to try election contests over the offices of governor and lieutenant governor avail against so sweeping a grant of power as this section is claimed to contain.

It is claimed broadly that section 153 is a grant of plenary power as to elections, and that under it, the provision that elections shall be free and equal and the principle of local self-government may be absolutely disregarded. It is a matter of history that the object which, above all others, was sought to be attained by the adoption of the new Constitution, was the placing of a check upon the power of the legislative branch. No one can compare that instrument with its predecessors without being struck by the almost countless restraints which are placed upon that power, and the safeguards provided against legislative usurpation. This central idea gives color and tone to the

entire organic law. What was intended by the provisions as to the creation of other courts than those provided for by the instrument itself? Concede that ministerial election officers had, without question, from the beginning of the government of Kentucky, been permitted to exercise functions at least *quasi* judicial. Concede, too, that the successive readoption in the various Constitutions of the identical language used in providing for the division of the powers of government was a tacit recognition that such exercise was excepted from the operation of that provision. We may even disregard the omission from section 109, providing in what courts judicial power shall be vested, of the provision for "such inferior courts as the Legislature may from time to time ordain and establish." There still remains the provision in section 135: "No courts, save those provided for in this Constitution, shall be established." To what did this apply? In terms, it applied to everything which answered the description of a court. It applied to the superior court; to the various courts of common pleas and criminal courts that had been theretofore from time to time established. And it applied to election tribunals. They were courts. They sat as courts. They were addressed as courts. Lawyers and litigants so regarded them. They presided upon the trial of causes. They rendered judgments determining the rights of parties, and from those judgments appeals were taken to superior courts. They were in the main, and except in case of disability, constituted of judicial officers. The people by whose overwhelming vote this instrument became organic law, and by whose common understanding these provisions are to be interpreted, understood them to be, and treated them as, courts. When that instrument was before the people for adoption, there was debate and discussion over

Pratt v. Breckinridge.

its provisions in the press and on the stump. We may consider in construing it (for it is a matter of history) that at every meeting its advocates proclaimed it as a remedy for overlegislation, as a check upon the abuse of legislative power. It is not to be supposed that every citizen who voted for its adoption had read it, or was familiar with all its provisions; but we know that those who voted for it did so in the belief, everywhere proclaimed, that it would stop abuse of legislative power. It was attacked fiercely and bitterly by a large number of the leading newspapers of the State. Practically the whole membership of the convention went upon the platform in its defense, and, while they differed in their estimates of its advantages, the burden of each argument was still that it was a shield to the citizen against legislative usurpation, encroachment, and abuse. It is not believable that the men who under such circumstances voted for the adoption of the instrument thought for a moment that they were clothing the Legislature with a power so enormous and so tyrannous as is claimed to be conceded in section 153. Construe the two sections together, as it is claimed should be done, apply to them the test of reason or of grammar, and ascertain which of them forms an exception to the powers granted by the other. The claim is that, read together, the sections mean, "No court, save those provided for in this Constitution, shall be established, except that the Legislature has plenary power to provide courts for a trial of election contests." The sections do not so read. The language is, "The General Assembly shall have power to provide by a general law for a trial of contested elections, except as herein expressly provided, to-wit: no courts, save those provided for in this Constitution, shall be established."

When we consider the radical changes made by the new

Constitution and the laws enacted thereunder, and the necessarily imperfect presentation of the new questions arising under them, it need excite no surprise that the court finds it necessary to sometimes change its rulings in arriving at a correct conclusion. We refer to two instances only: The Bank Tax cases were argued at length and decided in 1895. The contention of the banks was sustained by a bare majority of the court. That decision was overruled in 1897 by a bare majority of the court, although three new members had been added to the court. Doubtless bank stock and other trades had been made during the two years in reliance upon the first decision being adhered to as the law, but that was not deemed a sufficient reason for adhering to an erroneous decision. In Belknap v. City of Louisville  99 Ky., 474 (18 R., 313), 36 S. W., 1118, this court held that, under section 157, it required two-thirds of all the voters voting at an election, to vote for the bond proposition submitted, in order to authorize the issue thereof, and that two-thirds of those voting on the question were not sufficient. In the case of Montgomery County Fiscal Court v. Trimble, 104 Ky., 629, 20 R., 827, 47 S. W., 773, 42 L. R. A., 738, this court decided exactly the contrary,—five to two,—overruling the Belknap case and two other cases; and that, too, notwithstanding the fact that the vote had been taken in Montgomery county while the opinion in the Belknap case was in full force. It would seem that the attempt to confer the power of contest on the commissioners is in violation of section 2, subd. 2, of the Constitution, which provides that "absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority."

The answer in this case calls attention to some facts which tend strongly to illustrate the arbitrary features

of the law: There is no provision by which the parties can escape a trial before the commissioners, even if, as charged in the answer, the members have made up and expressed their opinions; and it appears that one of the commissioners, as a member of the canvassing board, refused to sign appellant's certificate, and published in the press his opinion that appellee should have received the certificate. This same commissioner filled the vacancy made by resignation, and one of those appointed had, through the press, expressed the opinion that appellant ought not to have the office; and yet, under the law, it is claimed that these men must remain on the board,—in fact, the commissioners might try the case, although on the one side might be a near and dear friend or relative, and on the other a bitter and despised enemy. What could be more arbitrary than a statute authorizing such a proceeding?

The judgment or decision of the board of contest was null and void, and conferred no right upon appellee, and could not affect appellant's right and title to the office in contest, and the court below erred in rendering the judgment appealed from.

For the reasons indicated, the judgment of the court below is reversed, and the cause remanded, with directions to the court below to sustain the demurrer of appellant to appellee's petition, to overrule appellee's demurrer to appellant's answer as amended, and for further proceedings consistent with this opinion.

Judge Hobson, dissenting:

In Commissioners v. George, 104 Ky., 260, 20 R., 938, 47 S. W., 779, it was determined by this court that under our Constitution the Legislature may be empowered by law to elect subordinate

Pratt v. Breckinridge.

officers for the State government not named in the Constitution. That decision is in accord with the great weight of authority, and the settled practice in the State, long recognized by this court. In Taylor v. Com., 3 J. J. Marsh., 401, the only question decided was that an order appointing a clerk was not a judicial order from which an appeal could be taken. Nothing more than this was before the court or considered. The other cases cited in the majority opinion from this State are equally inapplicable. The Legislature of this State for years before the adoption of the present Constitution had elected not only the librarian, but the warden of the penitentiary. At that time the librarian was *ex officio* custodian of the public grounds and buildings. The office of caring for the State's library is no more within the province of the Legislature than the judiciary or the executive. It stands on the same plane as other offices created for the preservation of the property of the State—such as the keeper of the arsenal, the penitentiary, and the like. But, more than this, since the present Constitution was adopted the Legislature created the office of custodian of the public grounds, taking these duties from the librarian, and authorizing this court to elect the officer. Certainly the custodian of the public grounds is not more peculiarly within the province of the Legislature than any other inferior office created by law. If the election of such officers is peculiarly an executive act, and not within the power of the legislative department, though conferred by law, it is equally not within the power of the judiciary. Yet this court appointed the present custodian, and he is holding now under this appointment. The circuit courts of the State and the county courts have both for time immemorial exercised the power of appointment. But, although a large part of the

majority opinion is devoted to this question, it does not in fact arise in this case, nor was it made, as we understood, in the argument. The acts of a *de facto* officer are valid between third persons, however, invalid they may be so far as he is concerned. The election commissioners who sat upon the board which determined the election contest before us had been regularly adjudged by this court to be entitled to the office. Poyntz v. Shackelford, 107 Ky., 546 (21 R., 1323), (54 S. W., 855). They qualified under the authority of that decision, assumed possession of the office, and discharged their duties under it. Whether that judgment was erroneous or not, is immaterial. It was the official settlement of the question by the highest tribunal to which it could be taken. Appellee had no other recourse than to make his contest before the board as thus constituted. Its members were at least *de facto* officers, and the validity of their appointment can not be assailed in a collateral proceeding between third persons for the purpose of establishing the invalidity of their official acts. This is, in effect, conceded by the majority opinion; and it is difficult to perceive why the court discussed at such length, or undertook to determine, a question not before it. It is also immaterial that one or two of the commissioners had on a previous occasion expressed an opinion as to the law of the case; for, if such were the rule, six of the judges of this court would be incompetent to sit in this case, and in a large part of the suits in the courts the regularly elected judges would be unable to preside. The objection that the board threw out certain votes, and thus reached the conclusion that appellee had received the highest number of legal votes, is equally unavailing, because the question before the board was which of the two candidates had received the highest number of legal votes. This question they de-

cided in favor of appellee.  If they had jurisdiction to decide and did decide, then, however erroneous their reasons may have been, their decision is none the less valid. No principle is better settled than that a judgment can not be attacked collaterally because bad reasons were given for it.  In determining which of the two candidates had received the highest number of legal votes, the board, of necessity, had jurisdiction to disregard votes that were not legal, and to count only the legal votes.  The counties bear the same relation to the State in a State election as the precincts do to a county in a county election, or the counties to a district in the election of a representative in Congress.  In a number of cases decided under the present statute this court has upheld the throwing out of a precinct, or recognized this power in the county boards, where the votes were not legally cast.  Leeman v. Hinton, 1 Duv., 40, and Com. v. Jones, 10 Bush, 725, are explained, and held not to conflict with this rule.  Wilson v. Hines, 99 Ky., 224 (18 R., 233), 35 S. W., 627, 37 S. W., 148; Major v. Barker, 99 Ky., 310 (18 R., 104), 35 S. W., 543; Banks v. Sergent, 104 Ky., 843 (20 R., 1024), (48 S. W., 149); Creech v. Davis (21 R., 325), (51 S. W., 428). The House of Representatives of the United States has also uniformly exercised this power, and its right to throw out entire counties, where the votes were not legally cast, has, it is believed, never been challenged. This leaves in the case only the question of the authority of the Legislature to confer upon the board the power to hear the contest, and on this question the counsel for appellant have mainly rested their case.

Previous to 1850, the only constitutional officers in the State elected by the people were the governor, lieutenant governor, and members of the General Assembly. The Constitution itself provided how contested elections of these

officers should be determined. The Constitution of 1850,
which made a number of other officers elective, contained
in article 4, section 14, relating to this court, this provi-
sion: "The General Assembly shall direct by law the mode
and manner of conducting and making due return to the
secretary of State of all elections of the judges and clerk,
or clerks of the court of appeals aud of determining con-
tested elections of any of these officers." In article 8, sec-
tion 24, this provision was made: "The General Assembly
shall provide by law for the trial of any contested election
of auditor, register, treasurer, attorney general, judges of
circuit courts, and all other officers not otherwise herein
specified." Under these provisions, the General Assembly
created boards for the determination of contested elec-
tions, and made their decisions final. See Stanton's Rev.
St., c. 32, art. 7. The validity of these statutes was upheld
by this court in Batman v. Megowan, 1 Metc., 538. The
court said: "A board is to be constituted as prescribed
by the statute to examine the poll books and issue certifi-
cates of election. Another board is to be organized in
the case of a contested election for determining the con-
test between the claimants. Upon this last-mentioned
board the law devolves the duty and confers the power of
deciding who is entitled to the office. The courts have no
right to adjudicate upon these questions or to decide such
contests. . . . The decision of the contesting board is
made final and conclusive by the statute. By this provi-
sion, the Legislature evidently intended to accomplish a
two-fold purpose: A speedy and summary mode of decid-
ing cases of contested elections, and determining finally
and conclusively which one of the claimants was entitled
to the office, was very important, and, to effect this ob-
ject, the organization of this board was provided for. An-

other object equally important was to withdraw these con-
tests from the jurisdiction of the courts." This decision
was uniformly adhered to, and it was held not only that
the statutory remedy was exclusive, but that, in the ab-
sence of a provision of law applicable to a particular case,
no contest could be made.   Clarke v. Rogers, 81 Ky.,
43, 4 R., 929; Broaddus v. Mason, 95 Ky., 421 (16 R.,
38), 25 S. W., 1060; Stine v. Berry, 96 Ky., 63 (16 R.,
279), 27 S. W., 809.  The statutes were revised in 1873,
and the old law was re-enacted as to contested elec-
tions, with the exception that in the case of county officers
the judgment of the county contest board was not made
final, but an appeal was allowed from their decision to the
circuit court, and from thence to this court.  The county
boards were often not qualified to pass intelligently on
the questions presented, or free from local prejudice;
so, in the exercise of legislative discretion, it was
thought proper to except these minor contests out of
the rule, and to leave State offices as before.  Thus stood
the law at the time the new Constitution was adopted,
which substituted for the provisions we have quoted con-
cerning elections in the Constitution then in force the fol-
lowing: "Except as otherwise herein expressly provided,
the General Assembly shall have power to provide by gen-
eral law for the manner of voting, for ascertaining the re-
sult of elections and making due returns thereof, for issu-
ing certificates, or commissions to all persons entitled there-
to, and for the trial of contested elections." It is per-
fectly manifest that this provision was intended to take
the place of the two provisions quoted from the former
Constitution.  Certain contests are expressly provided for
by the Constitution, and certain regulations are made as
to the manner of voting, and therefore the section opens

with the words, "Except as otherwise herein expressly
provided." It is a familiar rule of construction that
where an old provision of law, which had a well-settled
judicial construction, is brought over into a new enactment,
it is held to have been enacted as a continuance of the
old rule—in other words, that it will be presumed if a
change of meaning was intended a different provision would
be made, and not that which has been judicially construed.
Not only so, but it will be observed that in this section
the power of the General Assembly to provide for the trial
of contested elections by general law is the same as its
power to provide by general law for the holding of the
election, the ascertaining of the result, and the issuing of
certificates to the persons entitled thereto; that is, the
plenary power of the General Assembly as to the holding
of elections and ascertaining the result does not stop with
the issuing of the certificate, but extends in precisely the
same manner to all cases of contested elections.

It is said, however, that the present Constitution differs
from the former one in this: that by section 109 the judicial
power of the Commonwealth is vested in the courts estab-
lished by the Constitution, and that by section 135 the
Legislature is forbidden to establish courts not provided
for by the Constitution. But if the constitutional con-
vention had designed to change the plenary power of the
Legislature on the subject of elections which it had always
enjoyed, and was expressly continued by section 153, they
would certainly not have done so in any such uncertain
way as this. For it must be remembered that up to this
time the jurisdiction of the courts of Kentucky over cases
of contested elections of State officers had always been
taken away. As the courts had never exercised this jur-
isdiction, and the Legislature had always controlled the

Pratt v. Breckinridge.

subject, and this control was expressly continued by section 153, it is evident that section 135, which is found under the head of "Circuit Courts," was intended to prevent the establishment of the superior court of common pleas, chancery, and criminal courts throughout the State, as had prevailed under the former Constitution, and to secure a uniform system of circuit courts in all the counties. By section 110, this court has such appellate jurisdiction as may be prescribed by law. By section 126, the jurisdiction of the circuit courts remains as then established, subject to the power of the General Assembly to change it. The same provisions are made by sections 139, 141, 142, and 143 for the inferior courts. The General Assembly was therefore expressly authorized to regulate the jurisdiction of all the courts of the State, and could grant or withhold jurisdiction in contested elections as it saw fit.

In the absence of any constitutional provision, the courts at common law had jurisdiction by *quo warranto* to hear and determine the title to office, and determine which of two claimants had been elected. McCrary, Elect., sections 369, 380; Cooley, Const. Lim., 787. What, then, could have been in the mind of the convention in framing this section of the Constitution, unless it was intended to clothe the Legislature with the power to create special boards, so as to secure a speedy determination of such contests, as had been the rule in this State then for 40 years? This construction of the Constitution has been followed by the executive, legislative, and judicial departments of the State ever since its adoption. By section 245, the governor was required to appoint three commissioners to revise the statutes of the State, to the end that they should conform to and effectuate the Constitution. The governor appointed three learned lawyers, two of

whom were members of the constitutional convention. They prepared and reported to the General Assembly an elaborate new act regulating elections, so as to conform to the changes made by the Constitution. But the article on contested elections they left as in the old law. This General Assembly, which has since been known as the "Long Parliament," and contained not a few members of the constitutional convention, and some of the best talent of the State, adopted the act without change as to contested elections; and, although there was much discussion about the changes inaugurated by the Constitution, no objection was made to the article on contested elections. Some years afterwards, the Legislature again revised the law, and again readopted the old provision as to contested elections in substance as they were before.

Certainly this legislative construction of the Constitution, acquiesced in by the people of the State, is entitled to respect. Not only so, but this court unequivocally took the same view, and considered that the well-settled rule under the old Constitution as to contested elections was still in force, and that the statute creating special boards for their determination was valid. In Steele v. Meade, 98 Ky., 614 (17 R., 1158), 33 S. W., 944, the appellee and the appellant were candidates for the office of clerk of the circuit court of Boyd county at the November election, 1892—the first election held under the new Constitution. Meade, the appellee, received the certificate of the canvassing board. Steele, the appellant, who was the incumbent, refused to surrender the office on the ground that he had received the most votes, and was sued for the possession of the office by Meade. Judgment was given against him, and he appealed. The judgment was affirmed on the authority of Stine v. Berry, 96 Ky., 63 (16 R., 279), 27 S. W., 809.

Now, that case arose under the old Constitution, and was the last case on the subject under it to come before this court. There the court said: "We understand, and so adjudge, that the statute in regard to contested elections for State and county offices is exclusive, and that, when a mode of contest is provided in a city charter for contesting the election of city officers, it excludes any other remedy. Such statutes are enacted with remedies providing for the speedy determination of such questions, and to take from the courts all original supervisory power over such contests." Following this, in Steele v. Meade, under the present Constitution, the court said: "If the canvassing board improperly performed its duty, then the writ of mandamus was the proper remedy; but if it did so properly, according to the returns before it, the remedy of the appellant was by inaugurating a contest before the proper board as provided by statute in such cases. That the canvassing board fully performed its duty has been determined by this court in Houston v. Steele, 98 Ky., 596 (17 R., 1149) 34 S. W., 6. And that the exclusive remedy provided in such cases for invalidating or impeaching the certificate of the canvassers was by a contest before the proper board is settled in Stine v. Berry, supra. The only issues in the case were issues of law, and the court properly determined them without the intervention of a jury." It will be observed from the report of the case that the distinguished counsel for appellant, Ex-Chief Justice Holt, of this court, expressly sought a reversal on the ground that the certificate of the canvassing board was only *prima facie*, and not conclusive, evidence of right; that the action was a *quo warranto*; and that the petition was defective because it failed to allege that Meade was elected or received the majority of the votes. If the statute was invalid, regulating contests before the board, his argument was un-

answerable, because, in the absence of a statute excluding
the jurisdiction of the courts in the action of *quo warranto*,
for which provision is made by our statute (Code, section
480), the issue he tendered could have been heard. The au-
thorities to this effect are numerous and without conflict.
See Parks v. State, 100 Ala., 634; 13 South., 756; People
v. Holden, 28 Cal., 124; Snowball v. People, 147 Ill., 260,
(35 N. E., 538); State v. Shay, 101 Ind., 39; State v. Morris,
14 Wash., 262 (44 Pac., 266); Attorney General v. Barstow,
4 Wis., 567; State v. Meilike, 81 Wis., 574 (51 N. W., 875).
The ruling of the court, therefore, upholding and en-
forcing the statute, was the only tenable ground on
which the affirmance could be placed, and it was
rested by the court solely on this ground. This case
was followed in Wilson v. Hines, 99 Ky., 221 (18 R., 233),
(35, S. W., 627, 37 S. W., 148), where the power of the
county contest board to annul the certificate given by the
canvassers was distinctly upheld. In Strong v. Jones, 101
Ky., 652 (19 R., 1298), 42 S. W., 752 (43 S. W., 704),
Jones contested the election of Strong to the office of
jailer; and, the contesting board having decided against
him, he took an appeal to the circuit court, but
failed to execute his appeal bond within sixty days,
as required by the statute. This court upheld the statute
and dismissed the case. The validity of the statute was
assumed, and jurisdiction taken to determine the rights
of the parties, in Banks v. Sergent (20 R., 1024), 48 S. W.,
149); Patrick v. Runyon (20 R., 1914), (50 S. W., 538); Creech
v. Davis (21 R., 325), 51 S. W., 428; Tunks v. Vincent
(106 Ky., 829), (21 R., 475), (51 S. W., 622); and Smith v.
Patton (103 Ky., 444), (20 R., 165), (45 S. W., 459). In An-
derson v. Likens, 104 Ky., 699, 20 R., 1001 (47 S. W.,
867), the question of the power of the court in
contested election cases was directly involved, and, after

saying that the circuit court had no jurisdiction, this
court gave the following reason for its decision: "For
the mode and time of judicial investigation as to the
meaning, legality, and regularity of the ballots thus
required to be sealed up and returned to the clerk of the
county court as the statute provides is by appeal to the con-
testing board, evidently intended to be invested with judi-
cial functions; thence by appeal to the circuit court; thence
to the court of appeals." In Booe v. Kenner, (105
Ky., 517 (20 R., 1343), (49 S. W., 330), the court
was earnestly appealed to to overrule Anderson v.
Likens, and it was insisted that, relying upon a previ-
ous decision of this court, the appellee had not gone before
the contest board, and that if that decision was overruled
he would lose his case, as the time had then expired for
going before that board; but notwithstanding this earnest
appeal this court held it "a wiser and sounder rule to let
the appeal to the courts follow the action of the contest-
ing board," thus upholding the statute. All these decis-
ions were unanimous, and are conclusive that this court
recognized the rule obtaining under the old Constitution
as still in force under the new.

It has been suggested that these decisions are not in
point as to State contests, as they all involved county
officers, and an appeal was allowed from the decision of
the county board to the courts. This distinction can not
be maintained. If the Legislature could not create a spec-
ial tribunal to hear the contest, but only the courts could
hear it, then in Steele v. Meade the appellant should not
have been turned out of court, and in Strong v. Jones the
judgment of the board was void, and might have been
ignored. So, in Booe v. Kenner, if the appellees were
not compelled to go before the county board, they had lost
no right by not instituting their contest. The point in all

these cases is that they recognized the right of the Legislature to create the board and confer upon it jurisdiction exclusive of the courts. The fact that an appeal lies in certain cases does not affect the character of the power exercised by the board. Under its power to regulate the jurisdiction of the court, the Legislature could allow or disallow appeals as it saw fit. The judgment of a tribunal without jurisdiction is a nullity. It confers no right. It takes away none. No appeal is necessary to set it aside. If a suit should be brought in a court of a justice of the peace on a cause of action of which he had no jurisdiction, and was by him dismissed, who would contend that on appeal from his judgment the circuit court might proceed and try the case on its merits? No rule is better settled than that, where there is no jurisdiction in the original tribunal over the subject-matter, on appeal the proceeding must be dismissed, and can not be tried on the merits, although the superior court had original jurisdiction in the premises. McKitrick v. Peter, 5 Dana, 588; Bassett v. Oldham, 7 Dana, 168; Howard v. Jones, 2 B. Mon., 527; Wigginton v. Moss, 2 Metc., 41; Fleming v. Limebaugh, 2 Metc., 267. The rule has also been recognized by the executive. The original bill was approved by the distinguished lawyer who was then governor, and commissions have been issued through several administrations pursuant to its require-ment. When the act before us was passed it was vetoed by the governor on other grounds, and passed by the Legislature over his veto; but it does not seem to have occurred to the learned executive that the Legislature continuing the policy which had been pursued in the State from its foundation, of keeping out of the courts these political questions relating to the election of State officers, was an infringement of the rights of the judiciary under the Constitution. See Senate Journal 1898, p. 960. Thus

Pratt v. Breckinridge.

we see that the legislation in question has met the approval, or at least the acquiescence, of all three departments of the State government. The rule so long followed by the executive, the legislative, and the judiciary of this State is recognized in other States, under constitutional provisions substantially the same.    In West Virginia the Constitution confers power upon the Legislature to provide by law for the trial of election contests.    The Constitution of the State is similar to ours, in the separation of the three departments of the government, and the judicial power of the State is vested in certain named courts.    It contains no provision similar to section 135 of our Constitution, but that is immaterial, as the whole judicial power of the State is vested in certain tribunals, and this by necessary implication excludes the creation of others by the Legislature.    Under these provisions the Legislature by statute directed election contests to be determined by a special tribunal, one to be selected by the contestant, one by the contestee, and the third to be appointed by the governor.    Two cases decided by such tribunals are reported in Loomis v. Jackson, 6 W. Va., 613, and Harrison v. Lewis, 6 W. Va., 713, under a resolution of the General Assembly.    In Virginia the Constitution is the same as in West Virginia, and in that State it is provided by statute that contests for the office of attorney general shall be decided by a special tribunal composed of three circuit judges, to be named by the governor.    The judicial power of the State, being vested in the circuit courts, could not be exercised by the circuit judge when sitting as a constituent part of another tribunal not recognized by the Constitution, and so this provision of law is substantially the same as the West Virginia provision.    To illustrate:    Five judges of the United States supreme

court were by an act of congress made members of a commission to determine a contested election of president of the United States in the year 1877. These five judges, when sitting as a part of that commission, could not exercise power conferred on the supreme court of the United States, although they constituted a majority of the justices, and could exercise such power when sitting in that capacity. In Colorado the Constitution is substantially the same as in Virginia, except that the clause relating to contested elections authorizes the Legislature to prescribe by law before what courts or judges cases of contested elections shall be determined. The Legislature authorized the city council of Denver to determine finally upon the election of its members, and the statute was upheld. Darrow v. People, 8 Colo., 417, (8 Pac., 661).

In Dill. Munic. Corp., sec. 200, it is said: "A constitutional provision that the judicial power of the State shall be vested in a supreme court and inferior courts does not disable the Legislature, in creating municipal corporations, from providing that the city council shall be the judge of the election of its mayor, members, and other officers, and from prohibiting the ordinary courts of justice from inquiring into the validity of the determination of the city council." In Texas, where the common-law jurisdiction of the courts by *quo warranto* is not recognized, it is held that the settlement of an election contest is a political question, of which the courts have no jurisdiction, and that the Legislature can not confer this jurisdiction upon the courts without constitutional authority to that effect. Williamson v. Lane, 52 Tex., 335; *Ex parte*, Whitlow, 59 Tex., 273. In Louisiana, where action of *quo warranto* does not prevail, it is held that the courts have no jurisdiction over these political matters without express legislative author-

ity. State v. Judge of Second Judicial District Court, 13 La. Ann., 89; State v. Police Jury, 41 La. Ann., 851, (6 South., 777). But, in the States where the common-law jurisdiction of the courts by *quo warranto* exists, it seems to be held without exception that the courts may determine cases of contested elections in an action of *quo warranto*. Although the power of the Legislature to create special tribunals for this purpose is also recognized, that latter remedy is held cumulative, and not to oust the courts of their jurisdiction unless such intention is satisfactorily shown by the statute. McCrary, Elect. sec. 369; Dill. Mun. Corp., sec. 202. But the judgments of the special tribunals, when rendered, are held conclusive on the parties. People v. Hall, 80 N. Y., 117; Packard v. Craig, 114 Cal., 95 (45 Pac., 1033); Allen v. Patterson, 85 Ill. App., 256; Lyon v. Dunn, 196 Pa., 90 (46 Atl., 384). See, also, on this subject, Parks v. State, 100 Ala., 634 (13 South., 756); People v. Holden, 28 Cal., 124; People v. Londoner, 13 Colo., 303 (22 Pac., 764, 6 L. R. A., 444); Snowball v. People, 147 Ill., 260 (35 N. E., 538); State v. Fransham, 19 Mont., 273 (48 Pac., 1); State v. McKinnon, 8 Or., 493; State v. Morris, 14 Wash., 262 (44 Pac., 266); Attorney General v. Barstow, 4 Wis., 567. Where the common-law remedy of *quo warranto* is not applicable, as in election cases on local option, taxes, county-seat removal, and other questions submitted to the people, it seems to be uniformly held that the statutory remedy is exclusive, and that where the statute has provided no remedy there can be no contest. Clarke v. Rogers, 81 Ky., 43 (4 R., 929); Taxpayers v. O'Kelly, 49 La. Ann., 1039 (22 South., 311); *Ex parte Towles*, 48 Tex., 413; Clarke v. Jack, 60 Ala., 271; Savage v. Wolfe, 69 Ala., 569. It may be safely asserted, therefore, from the authorities, that the result of an election

is a political question, properly within the sphere of the legislative branch of the government, and that the courts have only such jurisdiction in the matter as may be conferred by law.  See, in addition to above, Dickey v. Reed, 78 Ill., 261; Odell v. Wharton, 87 Tex., 173  (27 S. W., 123).

It has been uniformly held by this court that the county commissioners must pass upon the disputed ballots which are returned to them.  Houston v. Steele, 98 Ky., 599, 17 R., 1149, 34 S. W., 6; Booe v. Kenner, *supra*.  In passing upon these ballots they perform precisely the same function as the contest board which hears the case, where their decision is not acquiesced in.  If the contest board exercises judicial functions, then the county commissioners, in passing on the disputed ballots, also exercise these functions.  Yet it has been expressly held that the county canvassers must exercise this power.  If the Legislature may create one board to pass on these ballots, and make their certificate *prima facie*, why may it not create another board to review its action, and provide that the certificate of the county canvassers shall not be evidence after a decision by the second board?  The Legislature is given by the Constitution plenary power not only over the subject of elections, but the jurisdiction of the courts which are established by the Constitution; and, if it saw fit to confer upon no court jurisdiction to revise the action of the second board, has it not simply exercised a discretion expressly conferred upon it?  Under its power to regulate the jurisdiction of the courts, could it not have said that no appeal should lie to this court in a contested election case?  And if it could do this, as it undoubtedly could (just as it did provide in divorce cases), could it not under the same grant of power abolish the action of *quo warranto*, and say that the circuit court should have no jurisdiction in such cases?

An act of the Legislature will not be declared void by the court in a case of doubt. The State Legislature is supreme in political matters, except where by plain language or necessary implication power is withheld by the Constitution. The Legislature in the act before us followed a policy obtaining in this State since its organization,—to keep out of the courts these political questions. The provision that the judgment of the board should be final is of necessity an exclusion of jurisdiction in the courts to review the action of the board, and the Legislature, having power to fix the jurisdiction of the courts and to provide for the trial of contested elections, was authorized to continue the policy that was as old as the State itself. So it was that this court, in Purnell v. Mann, 105 Ky., 87 (20 R., 1146), (48 S. W., 407), held the act in question constitutional. This opinion was written by Chief Justice Lewis. Soon thereafter he retired from the bench, and the question of the validity of the act was again directely raised in Poyntz v. Shackelford, 107 Ky., 546 (21 R., 1323), (54 S. W., 855), and Sweeney v. Coulter, 109 Ky., 295 (22 R., 885), (58 S. W., 784). The purpose of establishing a court of appeals is to secure not only uniformity, but stability, in the laws of the land. The decisions of the court determining what the law of the State is are the basis upon which the life, liberty, and property of the citizen depend and the business of the State is conducted. The purpose of the Constitution in creating the court is to secure the people of the State against uncertainty of the law, so that they may know their rights. The law of the land is not to depend upon the personnel of the court when the case comes before it, for, if such were the rule, no one could know what the law of any case would be until it was decided. The rule of *stare decisis* binds the court, and the law of the land as

settled by previous decisions is as obligatory on it as on other departments of the government. Under this rule a question expressly determined by the court, and then again twice affirmed after a change in its membership, is settled, where these decisions follow a policy long recognized, and a number of previous decisions of the court.

The decision in this case is very far-reaching in its consequences. From the beginning in this State the city councils have been made the sole judges of the eligibility and election of their own members. This was well known to the constitutional convention. The Legislature has continued these provisions in the laws passed since the adoption of the present Constitution for the government of the cities of the State. See Kentucky Statutes, secs. 2771, 3043, 3267, 3486, 3635, 3698. The statutes as to all six classes of cities and towns are substantially the same. Such statutes exist in nearly all the States, and are upheld. They are all unconstitutional, under the rule now laid down by the court, though their validity has never been assailed in this State, so far as I am aware. The same provision is made by law in regard to the school board in many localities, and it has not been supposed that contests in these matters could only be settled in the courts. The public interests require a speedy settlement of such contests, to the end that the public business may be conducted. Judicial processes are entirely inadequate remedies. By section 4417, Kentucky Statutes, the school superintendent is empowered, for certain causes, to remove any trustee or teacher in his county, upon five days' notice of the charges against him; and by section 4453 he is authorized to summon witnesses and hear testimony. The validity of these statutes was recognized by this court. Matthews v. Rogers, 107 Ky., 236 (21 R., 905), 53 S. W., 413; Superintendent v. Taylor, 105 Ky., 387 (20 R.,

1241), (49 S. W., 38). By section 2615, Kentucky Statutes, the board of health is, authorized to revoke a physician's certificate. The provision was held bad for indefiniteness, but the power of the Legislature to pass a definite act is recognized. Matthews v. Murphy, supra; Driscoll v. Com., 93 Ky., 393 (14 R., 376), 20 S. W., 431. These and many other similar statutory provisions, which are generally upheld in this country, would seem to be unconstitutional under the rule now announced by the court. It is submitted that no man who voted for the adoption of the present Constitution, and none of its framers, had such a result in mind. The far-seeing men who formulated the policies of the State, by their talents and patriotism, rendered it illustrious. No sadder illustration of their wisdom in keeping political questions from the judiciary can be given than the history of this court for the past ten years. In a number of decisions, rendered unanimously the power of the Legislature to create boards to settle election contests was upheld and recognized. These decisions were followed by the Legislature in the enactment of the statute in question, continuing the policy that had so long existed in the State. The act was obnoxious to many who claimed that it was unfair in its provisions. Then on all questions as to its validity the courts divided, and stood four to three. For four years the majority opinions followed the previous rulings. These decisions are in accord with the great weight of authority elsewhere, and are not in conflict with anything that the court had before decided. Now, after a change in the personnel of the court, by the same vote of four to three, all this is overturned, and the opposite conclusions established. It would be an interesting study to count up how many statutory provisions long recognized as valid are declared unconstitutional by the opinion now rendered, and how

many previous decisions of this court it disregards or over-
rules.    The declaration of the court that arbitrary power
can exist nowhere in the State under the Constitution is
heartily acquiesced in, but on this ground it is maintained
that the opinion of the court is unwarranted, and beyond
the authority conferred on it by the Constitution.    I there-
fore dissent from the judgment of the majority.

Chief Justice Paynter, and Judge White, concur in this
dissent.

(Nov. 21, 1901.)

Chief Justice Paynter:

I fully concur in the elaborate and able dissent-
ing opinion delivered by Judge Hobson, and do not
desire to do much more than refer to some of the numer-
ous opinions of this court, which, with the knowledge of
their existence, have been disregarded or expressly over-
ruled by its opinion in this case, and also to refer to the
interpretation which the General Assembly and chief ex-
ecutives of the State have given the Constitution on the
question involved.    It was conceded by counsel for appel-
lant on the argument, and was not denied on considera-
tion of the case, nor is it in the opinion delivered, that if
the General Assembly has not the constitutional authority
to create a contest board composed of State officers, or
a State board of election commissioners, to try a contest
as to the State offices and other contests, it has not the
constitutional authority to create a contest board compos-
ed of county officers or of county election commissioners
to try a contest over county offices, as it would be, accord-
ing to the reasoning of the court, conferring judicial pow-
ers in each case on tribunals other than the courts of the
State.    The present Constitution and the Constitution of

1850 are the same with reference to the division of the powers of the State government into legislative, judicial, and executive branches. This court has expressly held that all contests must be instituted before contest boards, or has recognized the right of contestants to institute proceedings before them, in the following cases: Wilson v. Hines, 99 Ky., 221 (18 R., 233), 35 S. W., 627, 37 S. W., 148; Major v. Barker, 99 Ky., 305 (18 R., 104), 35 S. W., 543; Banks v. Sergent, 104 Ky., 843 (20 R., 1024), 48 S. W., 149; Creech v. Davis, 21 R., 325, 51 S. W., 428; Sweeney v. Coulter, 109 Ky., 295 (22 R., 885), 58 S. W., 784; Purnell v. Mann, 105 Ky., 87 (20 R., 1146), 50 S. W., 264; Poyntz v. Shackelford, 107 Ky., 546 (21 R., 1323), 54 S. W., 855; Broaddus v. Mason, 95 Ky., 421 (16 R., 38), 25 S. W., 1060; Anderson v. Likens, 104 Ky., 699 (20 R., 1001), 47 S. W., 867; Booe v. Kenner, 105 Ky., 517 (20 R., 1343), 49 S. W., 330; Stine v. Berry, 96 Ky., 63, 27 S. W., 809; Houston v. Steele, 98 Ky., 596 (17 R., 1149), 34 S. W., 6; Leeman v. Hinton, 1 Duv., 38; Com. v. Jones, 10 Bush, 725; Clarke v. Rogers, 81 Ky., 43 (4 R., 929); Batman v. Megowan, 1 Metc., 533. This court, in sixteen opinions, has recognized that the Legislature had the constitutional authority to create boards of contest. Four of them arose under the Constitution of 1850, and the balance under the present one. Nearly all of those which were delivered under the present Constitution arose before there was any controversy over what was commonly called the "Goebel Election Law." Judge Lewis delivered the opinion in Anderson v. Likens, and, when delivered, three of the members joining in the majority opinion in the present case were then members of the court. The court unanimously held in that case that the contest could only be instituted before the contest board. It was thought by the court that the case if Houston v. Steele was misleading, and, for

the express purpose of letting the profession and litigants know where contests should originate, it unanimously directed Judge Lewis to write in that opinion that they could only originate before contest boards. Judge Lewis had retired from the bench when the case of Booe v. Kenner was passed upon. As he did not expressly overrule Houston v. Steele in Anderson v. Likens, the court unanimously directed Judge Hobson, in writing the opinion in Booe v. Kenner, to overrule Houston v. Steele in so far as it was in conflict with the views of the court; the court expressly holding that a contest could only be instituted before a contest board. The same judges which then composed the court now compose it, with one exception. At the winter term of 1858 the case of Batman v. Megowan was passed upon by this court. Judge Simpson delivering the opinion of the court, said: "The law has designated the manner in which such questions shall be ascertained and determined. A board is to be constituted, as prescribed by the statute, to examine the poll books, and issue certificates of election. Another board is to be organized, in the case if a contested election, for determining the contest between the claimants. Upon this last-mentioned board the law devolves the duty and confers the power of deciding who is entitled to the office. The courts have no right to adjudicate upon these questions, or to decide such contest. They may by mandamus compel either of the boards to act when it refuses to do so without any good reason." When the case of Taylor v. Beckham 108 Ky., 278, 21 R. (1735), (56 S. W., 177), was before the court, it was thought that Batman v. Megowan had an important bearing upon the question involved as to the conclusiveness of the action of the Legislature. Judge Burnam concurred with the majority of the court, and delivered a separate concurring

opinion, in which he gave his reason therefor, and, among other things, said: "Similar questions to that at bar have been before this court in quite a number of cases, beginning with the celebrated case of Batman v. Megowan, 1 Metc., 533, in which the opinion was written by one of the ablest and most celebrated lawyers which ever adorned this bench." Judge Guffy concurred in the separate opinion delivered by Judge Burnam, saying: "I concur in and adopt the foregoing as my view of the questions involved." In Major v. Barker, supra, Judge DuRelle delivered the opinion of the court, which recognized that it · was proper to institute contest proceedings before contest boards. The opinion is not only in conflict with this long line of adjudications, but is disregardful of the interpretation which the Legislature and executives of the State have given the Constitution since 1850. Besides, it disregards the plain letter of section 153 of the Constitution, which confers upon the General Assembly the power to provide by general law "for the trial of contested elections."

The court seems to desire to justify its opinion overruling cases by stating that this court overruled what was known as the "Bank Tax Cases" and the Belknap case. I think it made an unfortunate selection of cases wherein this court had overruled previous opinions. The first Bank Tax opinion was delivered in June, 1895, which was overruled in the spring of 1897,—less than two years after it had been delivered. The former opinion was delivered on a question about which there was much controversy, but, in the opinion of the court overruling the case, there was no occasion for it, as the plain provisions of the Constitution and statute made pursuant thereto had not been followed in the first opinion. It relieved certain banks of county and municipal taxation. This court held in the

opinion overruling it that the banks were not entitled to
such immunity. The United States circuit court of ap-
peals and the supreme court of the United States approved
the opinion of this court overruling its former opinion.
In the Belknap case the court was called upon to construe
a provision of the present Constitution. I was opposed
to the opinion of the court in the first Bank Tax case,
and also to the Belknap case. When the opinion of the
Belknap case was before this court in another case for re-
view, it, in full bench, overruled it. Two judges dissented.
Upon a re-examination of that case the court was convinc-
ed that it was in conflict with the plain provisions of the
Constitution, and none of the cases which were cited to
support the conclusion of the court did so.

The opinion delivered in this case is an unfortunate one,
and far-reaching in its consequences and effect. It un-
settles the law which had been settled in the State by num-
erous decisions, ranging over a period of fifty years, and
it is in disregard of the interpretation which every branch
of the government has given the Constitution for that
period. It is revolutionary in character. It is such opin-
ions as this that bring reproach upon courts.

Opinion by Judge Guffy denying petition of appellee for
rehearing.

The reasons and authorities in the opinion rendered
herein, as to the power of the Legislature to ap-
point election commissioners, are so conclusive of the
question that I shall not make any response to the petition,
in so far as it assails the opinion on that question. The
power of the Legislature to create separate courts or
tribunals, for the sole purpose of trying contested elec-
tions, and rendering final judgment therein, is of so much
practical and far-reaching importance that I deem it proper

to respond to some of appellee's contentions, and to discuss some of the former decisions of this court relied on by appellee.

It is the contention of appellee that the constitutionality of the act creating the election board and conferring upon it the powers in question has been decided by this court and its constitutionality upheld (referring to Purnell v. Mann, supra, and that the constitutionality was again affirmed by this court in the case of Sweeney v. Coulter, supra, and it is insisted for appellee that numerous cases have been decided since the adoption of the present Constitution upholding the exercise of judicial power by the contest board. It is also suggested that so many decisions upholding this board of contest should be conclusive of the constitutionality of the board. It is further contended that section 153 of the Constitution expressly authorized the Legislature to create a board for the trial of contested elections. Said section reads: "Except as otherwise herein expressly provided, the General Assembly shall have power to provide by general law for the manner of voting, for ascertaining the results of elections and making due returns thereof, for issuing certificates or commissions to all persons entitled thereto, and for the trial of contested elections."

Appellee cites Purnell v. Mann, supra. The question presented for decision in that case was as to the power of the county commissioners to exercise the authority conferred upon them by the State commissioners. That question, of course, involved the question of the power of the State commissioners to make the appointments. It is true that the court seems to have held the entire act constitutional. But courts do not feel bound by decisions or opinions on questions not before the court at the time for

decision. The opinion in the case does decide that the act
authorizing the State commissioners to appoint county
commissioners is constitutional, and it thus became cer-
tain that they were executive officers; and, this being true,
it may well be argued that they could not exercise judicial
power because forbidden by sections 27 and 28 of the Con-
stitution, which sections are as follows:

"Sec. 27. The powers of the government of the Common-
wealth of Kentucky shall be divided into three distinct
departments, and each of them be confined to a separate
body of magistracy, to wit:  Those which are legislative,
to one; those which are executive, to another; and those
which are judicial, to another.

"Sec. 28. No person, or collection of persons, being of
one of those departments, shall exercise any power proper-
ly belonging to either of the others, except in the instances
hereinafter expressly directed or permitted."

It is a familiar rule of law that part of an act of the
Legislature may be held valid and the residue invalid. It
might be conceded, but I do not concede it, that all the
powers attempted to be conferred by the act in question
were valid except the power to try contested elections, and
still the judgment appealed from might properly be held
void because the board had no power to try and determine
the contest.  We deem it not improper to remark that the
decision in the case, supra, was by a divided court, three of
the judges dissenting. It is, however, urged for appellee
that, under the former Constitution certain executive offi-
cers were authorized to hear and determine contested elec-
tions, and that the validity of the same was never ques-
tioned, and the former Constitution had the same pro-
visions as now appear in sections 27 and 28 of the present
Constitution.  It must, however, be remembered that the

validity of the act was never called in question, at least not directly denied, in any proceeding. We call to mind but one contested case that ever came before the board under the former Constitution, viz., the Cochran-Jones case. It may be that this court recognized the validity of the act in discussing the case of Com. v. Jones, 10 Bush, 725. The board had decided that Jones was ineligible to the office of clerk of the court of appeals because he had accepted a challenge to fight a duel, and therefore declared the office vacant. Jones continued to discharge the duties of the office, and was indicted for usurpation. The court, as I understand the decision, had but one question before it for decision; viz., did the board have authority to hear and determine whether Jones had violated the law against dueling, and, if he had done so, to adjudge him not entitled to the office? The court held that the board had no such authority, and Jones continued to hold the office. No other question was involved in the decision of the board, and no other question could be involved in the decision. The opinion expressed by the court in discussing the question is entitled to much respect, but is no authority.

Attention is also called to the fact that since the adoption of the present Constitution the Legislature enacted the same or a similar law, and that its validity remained unquestioned. It is true that such a law was enacted, and one contested election case tried by it. The question of its constitutionality was not raised before the board nor was the case or question before any court. It may, however, be safely said that some lawyers questioned the constitutionality of the act during the pendency of that contest. The contestant failed, and the successful candidate resigned the office; hence there was no reason for an appeal to the courts.

The opinion in Poyntz v. Shackelford (Ky.) 54 S. W., .855, does not affect the question under consideration. After the commissioners had issued certificates of election to the State officers, including appellant, who had received the greatest number of votes according to the returns, two of the commissioners, Messrs. Pryor and Ellis, resigned, and Poyntz appointed Judge Fulton, and he and Fulton appointed Mr. Yonts to fill the vacancy. Gov. Taylor also .appointed Messrs. Mackoy and Cochran. Poyntz brought .suit to enjoin Shackelford from administering the oath of ·office, etc., to Cochran and Mackoy. The circuit judge granted the injunction, and in the same order dissolved it, and Poyntz applied to a judge of this court to reinstate the same. By consent of the judges, the motion was heard by the whole court as a court. Two questions only were presented for decision, and only two were decided, viz.: Had there been an injunction granted and dissolved? or, in other words, was the action of the circuit judge such as to present a case for reinstatement of an injunction? The court in a majority opinion decided in favor of Poyntz, which decision has, however, been overruled in a later opinion by a majority of the court. The other question was as to whether the appointing power vested in the governor or in Poyntz, and the court decided that question in favor of Poyntz.

The case of Sweeney v. Coulter, supra, is also cited. The principal question discussed in the opinion was the right of appellant to dismiss his appeal without prejudice. The judgment in that case had been rendered at the same term of the circuit court that the judgment in the case at bar was rendered. Sweeney appealed, and superseded the judgment. Soon thereafter appellee, Coulter, procured a copy of the record, and filed it in the

Pratt v. Breckinridge.

clerk's office of this court, and soon afterwards moved to affirm as a delay case, and appellant moved to dismiss the appeal without prejudice. The court refused to sustain either motion, but finally advanced the case, and decided that appellee was entitled to have the case tried, and that appellant could not dismiss the appeal without prejudice. The judgment appealed from was affirmed. The question of the constitutional power of the board to hear and determine the contest does not seem to have been discussed at length. The court, however, assumed that this court in Purnell v. Mann had decided that the commissioners could lawfully hear and decide the contest. So it may be taken that this court, by a bare majority, did hold that act to be valid in a case where and when it was directly in issue. The decision, supra, was rendered October, 1900. If the decision was not a correct exposition of the law at the time, we are unable to perceive any good reason why it should be adhered to.

Courts sometimes refuse to overrule a former decision for the reason that contracts had been made upon the faith thereof, and that all persons had a right to rely upon the soundness of such opinion, and had parted with valuable rights upon the faith of such decision. But no such reason exists in this case. The appellee had selected the board in question, or the tribunal, to try his contest, months before the rendition of the opinion in Sweeney v. Coluter. The board had decided in his favor, and he had obtained the judgment appealed from, before the rendition of said opinion. No other case will be affected by the decision in this case. The board no longer exists; hence no other case can arise involving the question now before us, at least not while the present law remains in force.

If a majority of this court believe that the appellant

in Sweeney v. Coulter was wrongfully deprived of an office, and if we also believe that the appellant in this case was elected to the office in contest, and that the board of contest had no constitutional right to try and decide the contest, ought we to affirm the judgment simply because of former decisions of this court? We think not.

It is further argued for appellee that since the adoption of the present Constitution this court has recognized the validity of the act in respect to county contest boards, and several cases cited. It will be seen by examination of the Acts of 1891-'93 that the county contest board was to be composed of the county judge and the two justices of the peace residing nearest the court house; but if any of said persons were absent from the county, or could not properly act, then the vacancy should be filled by the county clerk. It is further provided that if either party shall make affidavit, etc., as to either or both of the justices, to the effect that they will not give fair and impartial trial, then the board shall be filled by other justices. An appeal from the decision was allowed to the circuit court, and thence to this court. It will be seen that primarily the members of the county board are all judicial officers, except in a contingency the county clerk might become a member. Several cases of contested elections from different counties have reached this court by appeal within the last few years. No question as to the jurisdiction of the county boards was ever raised in this court, nor ever decided by this court, since 1891. If the parties to the contest failed to object at the time to the jurisdiction of the county board, it may well be doubted whether such objections would have been considered on appeal. Moreover, as the county board was primarily to be composed of judicial officers elected by the people of the county, and a

right to appeal from the decision given, it became a mat-
ter of little importance whether the board was constitu-
tionally created or not.  The act creating county boards of
contest was not in violation of the former Constitution,
except in so far as it imposed duties upon the county clerk,
and, as that part only became effective in a contingency,
that question was of little concern; hence never objected
to, so far as we are advised.  Moreover, under the former
Constitution, the Legislature, by article 4, sec. 1, was au-
thorized to establish courts (inferior to the supreme court)
in their discretion and without limit.

It is further contended for appellee that section 153
of the Constitution authorized the Legislature to create
the contest board and confer the power in question.  The
section reads as follows:  "Except as otherwise herein
expressly provided, the General Assembly shall have power
to provide by general law for the manner of voting, for
ascertaining the result of elections and making due returns
thereof, for issuing certificates or commissions to all per-
sons entitled thereto, and for the trial of contested elec-
tions."  Mr. Bouvier's definition of "court" is, "A body
in the government to which the public administration of
justice is delegated."  One definition given in Mr. Web-
ster's International Dictionary is, "A tribunal established
for the administration of justice."  We do not think that
the section, supra, sustains the contention of appellee. It is
clear that the commissioners, sitting as a board of con-
test are a court, if anything, invested with original, su-
preme, and final power to adjudicate and determine judi-
cial rights and privileges of the utmost importance to the
parties to the contest, and also to the public.  We can
not believe that the framers of the organic law ever in-
tended to invest the Legislature with such power, and we

are sure that no such intention is clearly expressed, nor can it be fairly implied from the language used. It will be seen that the section provides that the Legislature may provide for the manner of voting, etc., naming several things, and concluding with the words, "and for the trial of contested elections." Evidently the last part of the section should be read as if the word "manner" followed the word "and." It is manifest that the intent and meaning of the section is that the Legislature should have the power to prescribe the manner of proceeding to obtain a decision in such cases in some of the courts established by the Constitution. The section seems to recognize that some constitutional provisions had been or would be adopted touching the subjects mentioned in said section 153; hence it follows that the authority conferred by section 153 is subject to the other provisions of the Constitution.

Section 109 of the Constitution provides that "the judicial power of the Commonwealth, both as to matters of law and equity, shall be vested in the senate when sitting as a court of impeachment, and one supreme court (to be styled the court of appeals), and the courts established by this Constitution." Section 135 reads: "No courts, save those provided for in this Constitution, shall be established." Section 110 refers again to the court of appeals, and provides for the election of its judges. Section 125 establishes a circuit court for each county. Section 139 established quarterly courts. Section 140 created county courts, and sections 142 and 143 provided for justice and police courts, and section 144 provided for fiscal courts. It will be seen that the Constitution has established a number of courts, naming them, and section 135 prohibits the establishment of any courts not provided for by the Constitution.

It is clear to us that the board of contest under con-

sideration, if anything, is a court, under any definition of
a "court" that can be given or imagined. Not only so,
but it is a supreme court. It has greater power in regard
to some of the most vital and important questions than
the court of appeals. It has been given original jurisdic-
tion to hear and determine a contest as to the right to
hold all the important offices of the State except governor
and lieutenant governor, and no appeal can be taken from
its decisions. It might determine that a judge or judges
of this court who had been upon the face of the returns
elected, and who held the certificate thereof and commis-
sion, should not hold the office, and adjudge another en-
titled thereto, and such decision would be final and con-
clusive.

It has been suggested that precinct officers of election
exercised judicial power. It is true that they hold the
election, but the Constitution prescribes the qualification
of voters. It necessarily follows that the officers must, in
a summary way, determine whether the person offering to
vote has the prescribed qualifications. So a sheriff in
taking a replevy or bail bond must determine the suffi-
ciency of the surety, and thereby the rights of the party
are determined. The same may be said of the clerk of a
court in respect to many of his duties. The duties of the
election officers are quite similar to those above named.

The power of the Legislature to create or provide for
State officers is to be found in section 93. The first of
that section provides for the election of treasurer, auditor,
secretary of State, commissioner of agriculture, attorney
general, superintendent of public instruction, and register
of the land office. The last of the section provides as fol-
lows: "Inferior State officers, not specially provided for
in this Constitution, may be appointed or elected in such

manner as may be prescribed by law for a term not exceed-
ing four years, and until their successors are appointed
or elected and qualified." Thus it will be seen that only
inferior State officers can be created. The contest. board,
as we have already seen, are superior officers, and their
appointment can not be upheld under the authority of the
section, supra. . If, however, section 153 gives the Legis-
lature the plenary power contended for by appellee, then,
of course, one man might be appointed with power to ap-
point all the county officers to hold the elections, and then
this same commissioner to receive the returns, count the
votes, issue the certificates, and then sit as a contest board
or court for the trial of contested elections. It would be
strange, indeed, if the framers of the Constitution, after
manifesting much desire for the protection of the rights of
the people, the purification of elections, and for the en-
forcement of the will of the voter expressed at the polls,
should invest the Legislature with such an arbitrary power
as the contention of appellee implies, and, too, in respect
to so important a question as is therein involved. Our
opinion is that so much of the act in question as attempt-
ed to confer power upon the election commissioners to
hear and decide contested election cases, is and was uncon-
stitutional and void, and that the attempt to exercise such
power was unlawful, and the decision of the commissioners
in the case under consideration was and is null and void
and of no effect; and, this being so, the judgment appealed
from is erroneous.

But it is said for appellee that, the validity of the law
having been upheld by this court, we ought not now to
overrule or disregard that decision, and we are referred to
Cooley, Const. Lim., (6th Ed.), p. 64. The quotation reads
as follows: "Mr Cooley, in his work on Constitutional

Pratt v. Breckinridge.

Limitations, quoting from Chancellor Kent, says: 'A solemn decision upon a point of law arising in any given case becomes an authority in a like case, because it is the highest evidence that we can have of the law applicable on the subject; and, further, where a rule has been once deliberately adopted and declared, it ought not to be disturbed, unless by a court of appeal or review, and never by the same court, for the most urgent reasons and upon a clear manifestation of error, and if the practice were otherwise it would leave us in a perplexing uncertainty as to the law.' " We think that the rule announced in the quotation would not be violated by overruling or departing from the decisions relied on by appellee. But, be that as it may, we do not think that this case comes within the rule announced by the learned author. It can not be said that the decision was solemnly and deliberately adopted, in the sense which the author thinks should be so obligatory. All the decisions in support of the law were rendered by a bare majority of the court, and from the passage of the law in 1898 to its repeal last year it was vehemently assailed by a large portion of the people and press of the country.

It is proper to remember that the Constitution of 1849-'50 remained in force for more than forty years, and that the Constitution of 1891 made many radical changes; hence it might be reasonably expected that the Legislature, in the hurry and excitement incident to the new order of things, would occasionally enact some laws in conflict with the new Constitution. It may also be observed that this court overruled quite a number of decisions rendered since the adoption of the present Constitution other than those cited in the opinion herein. Appellee in his petition cites the

following cases in support of his contention that this court has frequently sustained the power of the Legislature as contended for by him, to wit: Steele v. Meade; Wilson v. Hines; Strong v. Jones; Banks v. Sergent; Patrick v. Runyon; Creech v. Davis; Smith v. Patton; Anderson v. Likens; Booe v. Kenner; Major v. Barker; Sweeney v. Coulter; Purnell v. Mann; Poyntz v. Shackelford; Broaddus v. Mason.

I have carefully examined the decisions above referred to, and not one of the contests originated or was tried after the enactment of the election law under consideration, known as the "Goebel Election Law of 1898." The cases of Sweeney v. Coulter, Purnell v. Mann, and Poyntz v. Shackelford were not appealed from the contest board, but were tried under the provisions of the election law of 1898, and have heretofore been discussed in this response.

As before stated herein, the law providing for these contest boards prior to 1898 provided it should be composed of judicial officers, with only a bare chance that one of the board might be the county clerk, and it would by no means follow that if such a board was held to be constitutional that such holding would mean or imply that the boards provided for in the act of 1898 would be constitutional. Moreover, in all these appeals from the contesting board to the circuit court, and thence to this court referred to by appellee, no question as to the constitutional power of the Legislature to create and establish such boards was ever questioned or discussed. Hence it necessarily follows that this court has never passed upon the constitutionality of such boards since the adoption of the present Constitution. It therefore follows that the decisions referred to are not at all binding upon this court, for the reason that

the question here presented was not involved or decided in the cases relied on by appellee. It may be further remarked that, inasmuch as the parties to these contests have willingly gone before the county contest boards and submitted their case under a provision of the statute for an appeal to the circuit court, and thence to this court, this court would have had no power to have adjudged the action of a county board null and void for the purpose of dismissing the appeal from the circuit court.

The case of Thompson v. Koch, 98 Ky., 400 (17 R., 941), (33 S. W., 96), was an appeal from the decision of the circuit court of Jefferson county rendered upon an appeal taken to it from a judgment or order of the license board of the city of Louisville, which had refused to grant liquor license to an applicant. In that case it appears that the applicant for the license insisted that no appeal could be taken from the judgment below to this court; that the board of license was merely advisory, or, at best, a tribunal with special and limited power, and can not in any sense be deemed a court, because the present Constitution prohibits the creating of any other courts than those mentioned in that instrument. This court in response said, in substance, that there could be no objection to that character of legislation requiring or granting appeals from the judgments of boards of cities and towns, whether of the one class or the other, where those boards are vested with the power of determining questions affecting the rights of citizens. It is further held, in effect, that the power to grant license must be vested in some body connected with the municipal government; and, besides, this appeal comes from the circuit court, and its judgments are subject to the

revisory power of this court, unless prohibited by law. It is further said that an appeal lies to this court from judgments of circuit courts in all cases other than those executed by statute. It will thus be seen that this court has, in effect, decided that, without any regard to the legality of the board or tribunal of first instance; if an appeal is allowed by law to the circuit court, and if the circuit court tries and decides the matter, an appeal lies therefrom to this court. I do not wish to be understood as intimating that the Legislature, under the present Constitution, could constitutionally establish such county boards as were in existence prior to the law of 1898, but have deemed it necessary to discuss these questions as indicated, for the purpose of showing the fallacy of appellee's argument.

A few days since appellee filed a supplemental petition, in which it is suggested that this court, in an opinion delivered by the Chief Justice on the 15th January, 1902, Tousey v. Stites, 23 R., 1738 (66 S. W., 277), upheld the legality of the board in regard to a local option election. The writer of the petition has fallen into an error of fact as well as an error of law. The Chief Justice did not deliver the opinion, but the opinion referred to was delivered by Judge White. There was no reference made to the constitutionality of the election law in question, nor to the legality of the board to try such contested election, either before the board of contest or the circuit court. No such question was considered by the court, nor is it referred to in the opinion delivered by Judge White. The writer of this opinion, Judge O'Rear and Judge DuRelle were, it is true, present. The sole question involved in the appeal

Pratt v. Breckinridge.

was whether the election held in a part of the Cloverport magisterial district had the effect to authorize the sale of spirituous liquors in the precincts so voting, the entire mag- isterial district having theretofore voted in favor of pro- hibition, and the election in dispute having been held with- in less than three years after prohibition had been voted in the entire magisterial district.   The circuit court held that the election was null and void, and from its judgment Tousey appealed, and this court affirmed the judgment of the circuit court, thereby holding that, after the entire magisterial district had by vote prohibited the sale of in- toxicating liquors, a subdivision thereof could not, by a separate vote, authorize such sale within such subdivi- sion; citing Com. v. Bottoms, 22 R., 410 (57 S. W., 493).

For the reasons given in Thompson v. Koch, this court could have taken jurisdiction of the appeal from the cir- cuit court, although it might have been of opinion that the contest board had no original jurisdiction to determine the question involved, the sole question being as to whether a vote could be taken in reference to the subject at all; or, in other words, whether the holding of the said election was not in law a nullity, the case having been appealed to the circuit court, and there tried out, without any ob- jection as to the means or manner in which a trial was asked.   The opinion in Hughes' Adm'r v. Hardesty, 13 Bush, 366, is conclusive as to this question, and is also ap- plicable to all the cases that have reached this court through the circuit court, referred to by appellee either in his brief or petition.   In the case last referred to, the appellee had prosecuted an appeal direct to the circuit court from a judgment of a justice's court quashing a re- plevin bond.   The case was heard by consent in the circuit court, and the order quashing the bond reversed, and

from that judgment the appellant prosecuted an appeal to this court. This court, in considering the case, said: "It is contended that the act of the General Assembly, under which the appeal was prosecuted directly to the circuit court, having been held to be unconstitutional (Jones v. Thompson's Ex'r, 12 Bush, 394), the circuit court had no jurisdiction to reverse the order of the justice's court quashing the bond. The appellant did not move to dismiss the appeal, or otherwise object to the jurisdiction of the court, but consented to a submission and trial of the case. The case was one of the subject-matters of which the circuit court had jurisdiction, and the objection to the jurisdiction, because the case had been brought directly from the justice's court to the circuit court instead of being brought there through the quarterly court, was waived by the failure to move to dismiss, and the consent of appellant to a trial by the circuit court."

It seems to be the contention of appellee that, in the absence of any statute providing for the trial of contested elections, the courts would, upon proper proceeding, have jurisdiction to hear and determine as to who was entitled to an office in dispute. The parties in the circuit court upon all those appeals having failed to object to the jurisdiction of the circuit court to hear and determine the cases, or to object to the jurisdiction of the contest board from which the appeals were taken, they could not be heard in this court to raise that question, or, in other words, were estopped to raise it for the reason given in the case, supra. It may be further observed that, prior to the passage of the law of 1898, the various contest boards had been composed of officers elected by the people, and in whom the people, courts and litigants had confidence; hence, during the short time since the adoption of

Pratt v. Breckinridge.

the present Constitution, neither the attention of the people nor of the courts was called to, or had any particular reason to investigate or determine as to, the constitutionality of such boards. It is worthy of note, too, that this court has never unanimously sustained the constitutionality of any part of the election law of 1898, nor can it be said that the country at large ever adopted as correct the few decisions given sustaining said law. Hence it follows that there is no force in the argument of appellee that the constitutionality of the act in question has ever been admitted so long that it ought to be considered settled, and not disturbed or questioned. The truth is that a large portion of the people and of the press constantly, vociferously, and vehemently demanded a repeal of the law until the same was repealed, and a law enacted giving to the courts exclusive jurisdiction of contested elections.

There is no force in the argument that it was intended by the framers of the Constitution or the Legislature to keep election contests out of the courts in order to keep political questions separate from judicial matters, because under the old board, as well as under the new, the great majority of contested cases were or could be appealed to the circuit court, and thence to the court of appeals.

I think the petition for rehearing should be overruled.